# In the United States Court of Federal Claims

No. 11-129C
(Filed: May 15, 2015)

```
*************************************
                                    *
H.J. LYNESS CONSTRUCTION, INC.,     *
                                    *    Cross-Motions For Summary Judgment
            Plaintiff,              *    On Damages
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH, Senior Judge:**

Plaintiff, H.J. Lyness Construction, Inc. ("HJL"), seeks damages stemming from the termination for convenience by the General Services Administration ("GSA") of HJL's contract to renovate and provide security improvements to the lobby of a federal building in Cincinnati, Ohio. Previously, this Court determined that Plaintiff's claims for its settlement costs were not barred. Defendant then conceded liability. The case is now before the Court on the issue of damages. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted with correction for a clerical error.

**I.    Facts**

On August 15, 2006, HJL entered into Contract No. GS05P06SLC3014 with GSA. Compl. at ¶ 2. The contract was a firm-fixed price contract in the amount of $1,830,000 for lobby renovations and security improvements to the John Weld Peck Federal Building in Cincinnati, Ohio. *Id.* The performance bond, certificate of insurance and security clearances were thereafter reviewed and approved by GSA and on November 9, 2006, GSA issued the initial notice to proceed ("NTP"). Appendix to the Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Partial Summary Judgment ("DA") 5. However, the NTP was rescinded by GSA on November 16, 2006, due to issues with the fire evacuation plan associated with the contract design. DA 159. The parties agree that in the brief period of time between when the NTP was issued and when it was rescinded, no performance of

1

the contract occurred.[1]  Affidavit of Carl P. Meglan at 6.  The contract was ultimately terminated for convenience on April 6, 2009.  DA 65-68.

In connection to the termination for convenience, on April 10, 2009, HJL requested the settlement proposal form which was transmitted to HJL eighteen days later.  DA 69-70.  On February 24, 2010, HJL contacted GSA and again requested the settlement proposal form.  Even though the contracting officer had stated that she would not consider HJL's settlement proposal, on March 17, 2010, HJL submitted it.  DA 85-90.  In the settlement proposal, HJL requested $563,792 as settlement for the termination for convenience.  DA 87.  HJL then resubmitted the termination settlement proposal to the contracting officer as a certified claim.  DA 82-90.  Sixty days passed following HJL's claim submission without a final decision from the contracting officer.  HJL then filed this suit seeking the amount of $563,792 that it had set forth in its settlement proposal.  *See generally* Compl.  After the filing of the Complaint, the Inspector General's office of the GSA conducted a multi-day onsite audit of HJL's settlement proposal.  DA 155-170.  The audit noted several discrepancies in HJL's proposed numbers and concluded that HJL was actually due $30,180.59.  *Id*.

## II.     Procedural History

The parties have filed cross-motions for summary judgment.  This Court has previously issued an Opinion in this case, holding that Plaintiff's claims were not barred by a May 6, 2009 release because the parties' course of conduct created a genuine issue of material fact on the matter.  *See H.J. Lyness Construction, Inc. v. United States*, 2015 U.S. Claims LEXIS 16 (Fed. Cl. Jan. 21, 2015).  The Court therefore denied-in-part Defendant's Motion, and ordered that Plaintiff's Motion be held in abeyance until liability was established.  *Id.*  The Court also ordered the parties to file a Joint Status Report outlining the next steps to be taken in the litigation, as the issues of liability and damages had yet to be determined.  *Id.*

Following this opinion, the parties filed a Joint Status Report ("JSR").  In the JSR, Defendant stated that it had "decided to waive any further argument concerning the release and will concede liability in this case."  JSR at 1.  Furthermore, "the parties respectfully request that the Court decide the issues concerning damages that were raised in the parties' cross-motions for summary judgment, enter an order deciding any material facts pursuant to RCFC 56(g), or take any other action that the Court deems proper."  *Id*.  The issue remaining before the Court is the amount of damages owed to Plaintiff.  Plaintiff avers that it is owed $563,792.00, the full amount asked for in the settlement proposal.  Defendant, on the other hand, contends that the GSA properly corrected amount owed to HJL as a result of the audit, and that $30,180.59 is the proper amount.

## III.    Legal Standards

A motion for summary judgment will be granted only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  RCFC 56

---

[1] During the delay, HJL performed work for GSA as a result of change orders issued by GSA.  For a full discussion of this work, see *H.J. Lyness Construction, Inc. v. United States*, 2015 U.S. Claims LEXIS 16 (Fed. Cl. Jan. 21, 2015).  This work, however, was not part of the base contract that is at the heart of the instant case.

(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it "might affect the outcome" of the suit; a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party. *Id*. at 248. Pursuant to RCFC 56(g), "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case."

The party moving for summary judgment may prevail by demonstrating via the pleadings or other materials in the record (such as depositions, documents, affidavits or declarations, stipulations, admissions, interrogatory answers, etc.) the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *Id*. at 324. Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant." *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).

**IV. Discussion**

Because the Defendant has conceded liability, the only issue remaining before the Court is the amount of damages that Plaintiff should receive from the termination for convenience. In its Motion, Defendant has provided a table breaking down the total amount sought by Plaintiff into various categories, showing where the parties are in disagreement – that table is as follows:

| Cost Element | HJL's Settlement Proposal (A87) | Adjusted Amount From Audit (A164-68) |
|---|---|---|
| Direct Material Costs | $72,864.00 | $72,768.39 |
| Direct Labor Costs | $10,382.00 | $8,502.53 |
| Other Costs | $96,762.00 | $33,222.50 |
| General and Administrative Expenses | $422,830.00 | $15,983.28 |
| **Total Costs** | **$602,838.00** | **$130,476.70** |
| Profit | $60,284.00 | $13,047.67 |
| **Subtotal** | **$663,122.00** | **$143,524.37** |
| Settlements with Subcontractors | $14,014.00 | $0 |
| **Net Amount** | **$677,136.00** | **$143,524.37** |
| Payments Made By GSA | $113,344.00 | $113,343.78 |
| **Total Amount Due To HJL** | **$563,792.00** | **$30,180.59** |

There is a discrepancy in seven of the cost elements listed: direct materials, direct labor, other costs, general and administrative costs, profit, settlements with subcontractors, and payments made by GSA. The Court shall turn to each cost individually in order to ascertain the correct amount owed to HJL.

    A.  *Direct Materials*

In its settlement proposal, HJL sought $72,864.00 in costs for direct materials. Pl.'s Mot. at 3. After performing its audit, GSA concluded that the proper amount should be $72,768.29. Def.'s Mot. at 7. The discrepancy of $95.61 was because that amount was incurred after the date of the termination for convenience and is therefore not compensable pursuant to FAR 49.206-2(b)(2). *Id.* In its Response and Reply, Plaintiff argues that Defendant has failed to point to a specific part of the record to support its position that the $95.61 was incurred after the contract termination date. Pl's Response and Reply at 4. However, as Defendant notes, the appendix shows a direct cost for certified mail of $95.87[2] incurred by Plaintiff on April 14, 2009, eight days after the contract was terminated. DA 204. The Court concludes that this cost was properly reduced by GSA and that the correct amount owed to Plaintiff for direct materials is $72,768.13.

    B.  *Direct Labor*

In its settlement proposal, HJL sought $10,382.00 in costs for direct labor. Pl.'s Mot. at 3. After performing its audit, GSA concluded that the proper amount should be $8,502.53. *Id.* The amount $1,879.47 was excluded due to HJL counting its fringe benefits expense twice, as both a direct labor cost and an indirect (general and administrative) expense. Def.'s Mot. at 7. GSA acknowledged that fringe benefits are an allowable expense but that because HJL had charged that expense indirectly, it could not charge that expense directly to the project. DA 164-165. Plaintiff does not disagree that it accounted for the costs as indirect costs; rather, Plaintiff argues that it should be allowed to recover this cost because it can be directly traced to the base contract between HJL and GSA. Pl.'s Reply and Response at 5-6.

The Court concludes that the fringe benefits expense of $1,879.47 was properly excluded by GSA in the audit. Plaintiff cites *Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 314, for the proposition that "costs that can be directly traced to a specific contract can be recovered if otherwise proven, regardless of how a contractor accounts for the same in its financial statements or records." Pl.'s Mot. at 4. However, nothing in *Orlosky* can be fairly interpreted as supporting the reading that Plaintiff now advances before the Court. Indeed, *Orlosky* is entirely silent on the issue of whether costs can be recovered if they can be directly traced and otherwise proven regardless of how they are accounted for by a contractor.

The Court agrees with Defendant that allowing Plaintiff to now recover the fringe benefits expense as a direct labor cost would result in a double recovery. Def.'s Mot. at 16. When Plaintiff made the accounting decision to classify the fringe benefits expense as an indirect cost, it lost the ability to recover it later as a direct cost. By accounting for the fringe benefits as an indirect expense, that expense has already been incorporated into the rest of Plaintiff's

---

[2] Defendant notes that although the actual amount is $95.87, due to an administrative error, the incorrect number of $95.61 was input. Def's Reply at 5.

indirect expenses and proportionally allocated among its other contracts, along with all other expenses accounted for as indirect expenses. This means that part of this cost has already been charged to Plaintiff's other contracts as an indirect expense. To now allow Plaintiff to recover this amount as a direct expense would lead to a situation where Plaintiff has overcharged its other contracts for its indirect expenses – in other words, it would allow Plaintiff to recover more than the actual cost itself. Thus, the Court concludes that GSA properly disallowed the fringe benefit expense. Plaintiff is entitled to $8,502.53 for direct labor costs. To the extent that Plaintiff can recover the share of indirect expenses unabsorbed by this contract, that amount is covered *infra* in Section D of this opinion.

C. *Other Costs*

In its settlement proposal, HJL sought $96,762.00 in other costs. This amount contains three components: $17,000.00 paid to Automatic Control Systems, Inc. as a deposit for security equipment, $16,222.50 paid to Wernke Welding & Steel for structural steel shop drawings, and $63,539.44 paid to Meglan, Meglan, and Company, Limited ("Meglan"), who assisted HJL with preparation of the requests for equitable adjustments and the termination settlement proposal. DA 165. After performing its audit, GSA did not dispute the first two amounts but found that the third amount was accounted for elsewhere by HJL as an indirect (general and administrative) expense. *Id.* at 8. GSA acknowledged that although this cost is an allowable expense, because HJL had charged the Meglan expense indirectly, it could not also charge that expense directly to the project. DA 165. As with the direct labor costs, Plaintiff does not dispute that it accounted for the Meglan expense as an indirect cost. Plaintiff advances the same argument: that it should be entitled to recover this expense regardless of how it was classified and accounted for because it can be directly traced to the contract.

For the same reasons discussed *supra* in Section B, the Court concludes that GSA properly disallowed the $63,539.44 paid to Meglan because it has been accounted as an indirect expense. Accounting for this expense as an indirect expense has allowed Plaintiff to allocate it proportionally among its other contracts. Allowing Plaintiff to recover the expense directly now, in its entirety, would result in a double recovery for Plaintiff. Therefore, the Court holds that Plaintiff is entitled to $33,222.50 in other costs.

D. *General and Administrative*

By far the largest amount sought by HJL relates to General and Administrative expenses, specifically unabsorbed overhead.[3] HJL seeks $422,830.00 in unabsorbed overhead relating to the delay. Pl.'s Mot. at 5. Plaintiff arrived at this number using a formula created specifically for this case by Carl Meglan, who also serves as Plaintiff's expert witness. In its audit, GSA

---

[3] Unabsorbed overhead is an indirect cost that has been described by the United States Court of Appeals for the Federal Circuit thusly: "Indirect costs include such things as home office overhead, defined as costs that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. Generally a contractor recovers these indirect costs by allocating a proportionate share to each of its contracts. However, when the government causes a delay or suspension of performance, this decreases the stream of direct costs against which to assess a percentage rate for reimbursement. In such a situation, a portion of the home office overhead is 'unabsorbed.'" *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed. Cir. 2003) (internal citations and quotation marks omitted).

5

rejected this calculation as "unsupportable" and "not based on any method approved under the case law" while noting the calculations contained various flaws, including not taking into consideration that "overhead expenses would have increased if HJL actually performed the contract work, HJL revenues showed no indication of being adversely influenced by the alleged 'hold' period, . . . and HJL's overhead rate also showed no pattern of being adversely influenced . . . ." Def.'s Mot. at 9.  Instead, GSA's auditors determined that the appropriate amount is $15,983.28.  *Id.*  Unsurprisingly, Plaintiff does not agree with this reduction and believes the original amount it submitted to be proper because it argues that it meets the criteria for recovery of unabsorbed overhead and that the formula used to calculate the amount is fair and reasonable. Pl.'s Mot. at 8.

The Federal Circuit has held that there is only one proper method of calculating unabsorbed home office overhead: the *Eichleay* formula, originally set forth in *Eichleay Corp.*, 60-2 B.C.A. (CCH) P 2688, at 13,568 (ASBCA July 29, 1960).  *See Wickham Contracting Co v. Fischer*, 12 F.3d 1574, 1575 (Fed. Cir. 1994); *see also Melka Marine Inc. v. United States*, 187 F.3d 1370, 1374-75 (Fed. Cir. 1999).  Before the *Eichleay* formula can be applied, a contractor must meet three strict prerequisites: (1) There must have been a government-caused delay of uncertain duration; (2) the contractor must show that the delay extended the original time for performance or that, even though the contract was finished within the required time period, the contractor incurred additional costs because he had planned to finish earlier; and (3) the contractor must have been on standby and unable to take on other work during the delay period. *Nicon*, 331 F.3d at 883.  Additionally, the *Eichleay* formula can only be applied in a factual situation where performance on a contract has begun – it is not applicable to a situation in which the contract is terminated before the commencement of performance.  *Id.* at 886.

Plaintiff concedes that the *Eichleay* formula cannot be used to calculate its unabsorbed overhead because performance of the contract had never started – GSA rescinded the notice to proceed before Plaintiff could begin performance, and this delay continued until the termination of the contract for convenience.  Def.'s Mot. at 5.  However, Plaintiff relies upon the narrow holding of *Nicon Inc. v. United States* for the proposition that its own formula should be allowed for calculating the unabsorbed overhead expense.  331 F.3d 878 (Fed. Cir. 2003).  In *Nicon*, the plaintiff sought damages for unabsorbed overhead where performance had never commenced before the contract was terminated for convenience by the government.  331 F.3d at 881.  The court held that "the *Eichleay* formula as it is set forth in our precedent is the exclusive formula for the calculation of damages for unabsorbed overhead due to a period of government-caused delay in situations where performance has begun" and that the formula "must be strictly applied and may not be modified to make it apply to situations in which there is no performance on the contract." *Id.* at 888.  However, the court also held that in situations in which contract performance has not yet begun, a contractor "may recover unabsorbed overhead costs as part of its termination for convenience settlement if a reasonable method of allocation can be determined on the facts of the case and the contractor can otherwise satisfy the strict prerequisites for recovery of unabsorbed overhead costs."  *Id.*  These strict prerequisites are the same ones a contractor must meet in order to use the *Eichleay* formula.  *Id.* at 887.

In the instant case, the Court finds that it need not determine whether Plaintiff's proposed formula for calculating unabsorbed overhead is reasonable because Plaintiff has not met the strict

6

prerequisites for recovery of unabsorbed overhead. As stated above, Plaintiff must show that (1) there was a government-caused delay; (2) the delay extended the period of performance beyond what was originally anticipated; and (3) that Plaintiff was required to remain on standby during the period of delay. Defendant concedes that the first two requirements have been met but argues that Plaintiff cannot meet the third requirement because it was not required to remain on standby during the delay. Def.'s Mot. at 19.

When determining whether a contractor was on standby during a period of delay, the court first determines "whether the CO [] issued a written order that [1] suspend[ed] all the work on the contract for an uncertain duration and [2] require[d] the contractor to remain ready to resume work immediately or on short notice. *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364, 1371 (Fed. Cir. 2003). If those two conditions are met, the contractor need not offer further proof of standby; otherwise, the contractor must demonstrate standby through indirect evidence. *Id.* The requirement to remain on standby is a demanding one; if a contractor is not required to return to work at full speed and/or full strength, the standard for remaining on standby is not met. *Id.* The contractor "must be required to keep at least some of its workers and necessary equipment at the site, even if idle, ready to resume work on the contract (*i.e.*, doing nothing or working on something elsewhere that allows them to get back to the contract sight on short notice). *Id.*

Furthermore, the Court of Federal Claims has previously held that "[a] contractor cannot be said to have personnel and equipment available to perform 'immediately and at full speed' when it makes extensive use of subcontractors and cannot guarantee the availability of those subcontractors." *Redland Co. v. United States*, 97 Fed. Cl. 736, 750 (Fed. Cl. 2011). In *Redland Co.*, the court, considering cross motions for summary judgment, found that the plaintiff "relied on subcontractors to perform a majority, if not the entirety, of the [] work." *Id.* The court further determined that plaintiff could not guarantee the availability of its subcontractors to return to work immediately and at full strength because, *inter alia*, plaintiff had not even entered into a contract with one of its prime subcontractors. *Id.* Thus, plaintiff could not meet the strict requirements of being on standby because "[p]laintiff's ability to start work immediately and at full speed thus depended no less critically on the availability of plaintiff's subcontractors than it did on the availability of plaintiff's own personnel and equipment" and could not recover damages for unabsorbed overhead. *Id.*

Plaintiff has not proffered any evidence that directly proves it was required to remain on standby – there is no written order by a contracting officer requiring Plaintiff to remain ready to resume work immediately or on short notice. Thus, Plaintiff must prove standby by indirect evidence. *P.J Dick*, 324 F.3d at 1371.

The Court finds that Plaintiff, like the plaintiff in *Redland Co.* cannot be considered to have been on standby because Plaintiff has offered little in the way of indirect evidence to suggest it was required to remain on standby by the government. Plaintiff has only submitted one piece of evidence to prove that it was on standby: the deposition of Erica Bradbury, the GSA contracting officer assigned to the contract. In that deposition, the following exchange occurred:

7

> Q. (Plaintiff's Counsel) Well, in any event, during the time that this problem was going on, Lyness was on standby to begin work on the base contract, weren't they?
>
> A. (Ms. Bradbury) Yes.

Deposition of Erica Bradbury at 22. Aside from that exchange, there is nothing to suggest that Plaintiff was required to remain on standby. For instance, Plaintiff has not produced any evidence that it kept workers and equipment at the site ready to commence performance on the contract, or any depositions of its employees to that effect. Furthermore, Ms. Bradbury was not the contracting officer assigned to the contract at the time the delay started. Affidavit of Harry J. Lyness, Exhibit Q. Ms. Bradbury was not assigned to the contract until August 12, 2008, nearly two years after the initial NTP was issued and rescinded. *Id.* Thus she is not the individual who would have placed Plaintiff on standby when the delay commenced. When asked other questions about the specifics of the base contract, Ms. Bradbury frequently responded that she did not know the answer. For example, Ms. Bradbury was unaware if HJL had ever been issued a notice to proceed, she was unaware of the status of the project at the time she came on, or why HJL was eventually terminated for convenience. The Court concludes that, standing alone, this testimony is not sufficient to prove that Plaintiff was required to remain on standby during the delay, especially considering that the requirement to remain on standby is a demanding one.

Additionally, Plaintiff intended to rely on subcontracts to provide the vast majority of the value associated with the contract. In a cost estimate sheet prepared by Plaintiff, Plaintiff estimated that the entire cost of the project would be $1,708,803.00[4], of which $1,519,325.00 would come from subcontractors, with the remaining costs consisting of estimated labor and material costs of HJL. DA 92. Clearly, Plaintiff intended to make extensive use of subcontractors in order to provide a majority of the contract's value. However, Plaintiff offers no evidence to suggest that it could guarantee the availability of its subcontractors or their ability to perform upon the contract immediately and at full strength. It is not apparent that Plaintiff had entered into a contract with all of the subcontractors required to resume work at full speed, or whether Plaintiff communicated with its subcontractors on the need to remain on standby themselves in order to assure performance on the base contract could be started immediately once the delay had ceased. With such a large portion of the work to be completed by subcontractors and no evidence to suggest that Plaintiff had the ability to resume work on the contract immediately and at full strength, the Court concludes that Plaintiff was not on standby. Accordingly, "plaintiff has failed to satisfy the strict prerequisites for recovery of unabsorbed overhead costs because it was not on standby during the period of delay." *Redland Co.*, 97 Fed. Cl. at 751 (internal quotation marks and citations omitted).

Nevertheless, Plaintiff will not be left without any compensation in this area. Although the GSA audit disallowed the entirety of Plaintiff's proposed general and administrative costs, the audit determined that Plaintiff is entitled to expenses based upon a G&A rate applied to its proposed direct costs. DA 167. GSA examined Plaintiff's fiscal years ended December 31, 2006, though December 31, 2009 (the fiscal years in which Plaintiff was affected by the contract delay), and determined that a weighted average G&A rate of 13.96 percent would be appropriate.

---

[4] The actual value of the contract awarded to Plaintiff was $1,830,000.

*Id.* GSA then applied that number to the audit adjusted numbers of Plaintiff's direct costs and arrived at a proposed amount of $15,983.28.[5] However, as noted above, due to a clerical error, the wrong amount for Direct Materials was computed. Using the correct amount, the Court finds that Plaintiff is owed $15,983.24. This amount shall be used by the Court in the final calculation for damages.

    E. *Settlements With Subcontractors*

Plaintiff seeks $14,014.00 owing to settlement agreements it entered into with three subcontractors.[6] Pl.'s Mot. at 4. In its audit, GSA concluded that because HJL failed to adhere to FAR Part 49, regarding termination of contracts and settlements with subcontractors, it could not recover this amount. Def.'s Mot. at 10. Specifically, the GSA found that HJL failed to provide (1) adequate accounting information to support the amounts negotiated with its subcontractors; (2) support showing Lyness submitted the subcontractor settlement agreements to the contracting officer for approval; (3) written and signed settlement agreements with its subcontractors; and (4) proof of payment or accounting data showing a liability of these settlements. DA 168.

FAR 49.108-3 is the regulation that governs the settlement procedure between a prime contractor and its subcontractors. It requires, *inter alia*, that each settlement must "be supported by accounting data and other information sufficient for adequate review" and that a prime contract must "submit, for approval or ratification, all termination settlements with subcontractors." FAR 49.108-3.

Plaintiff has provided no evidence to suggest that the required documentation was ever submitted to GSA. Rather, it appears that Plaintiff merely submitted invoices that it received from the three subcontractors, which GSA considered during the audit. DA 168. Plaintiff has included these invoices as part of the affidavit of Harry J. Lyness, submitted on August 8, 2014. The affidavit also notes that, regarding each invoice, Plaintiff communicated its acceptance of the demand for payment to each subcontractor. Affidavit of Harry J. Lyness, ¶7-9. However, no communication to the subcontractors indicating acceptance and payment of the settlement has been included, nor has any formal documentation, such as a settlement agreement signed by both Plaintiff and its subcontractor. It is clear from the record before the Court that Plaintiff did not follow the proper settlement procedure, as required by FAR 49.108-3. The documentation submitted to GSA at the time of the audit was insufficient to support the award of subcontractor settlement costs, and Plaintiff has failed to provide the Court with any additional documentation that could supplement the record on the issue. Therefore, the Court holds that GSA properly denied the costs associated with subcontractor settlements.

    F. *Profit*

---

[5] ($72,768.39 (Direct Materials) + $8,502.53 (Direct Labor) + $33,222.50 (Other Costs)) * 0.1396 = $15,983.28.
[6] This number is the sum of the following: a $1,500.00 settlement with Siemering Tile Co., Inc., a $7,324.00 settlement with McCool Plaster & Drywall, Inc., and a $5,190.00 settlement with Trebor Electrical Contractors. DA 168. GSA adjusted each amount to $0.00 in its audit.

In its settlement proposal to GSA, Plaintiff proposed a profit amount of $60,284.00. DA 167-168. Plaintiff arrived at this number by applying a profit rate of 10% to all of its direct costs as well as its general and administrative expenses. Compl. Exhibit B. In the audit, GSA accepted Plaintiff's proposed profit rate of 10%, but found the correct amount should be $13,047.67. DA 168. Defendant notes that the difference in profit amount reflects the disagreement over the cost total to which the 10% rate should be applied. Def.'s Mot. at 10. Nowhere in Plaintiff's Motion for Summary Judgment or its Response and Reply does it make any argument that this adjustment in profit cost total was improper. However, because Plaintiff's proposed profit amount is based on the sum of two other submitted amounts which are in dispute, the Court shall assume that Plaintiff intended to object to this amount and that the lack of inclusion is the result of a mere oversight.

Because the Court has determined that GSA properly disallowed portions of both direct costs and general and administrative expenses, *supra* Sections A, B, and D, the Court finds that the 10% profit rate should be applied to the amount of $130,476.40.[7] This yields a profit amount of $13,047.64. This amount shall be used by the Court in its calculation for total damages.

G.  *Payments Made by GSA*

In its settlement proposal, Plaintiff reduced its proposed amount by the payments it received from GSA for work performed in connection with various change orders that were at the heart of the Court's previous opinion in this case. *See H.J. Lyness*, 2015 U.S. Claims LEXIS 16 at *2-5. Plaintiff submitted that it had received $113,344.00. DA 168. In its audit, GSA corrected this amount to $113,343.78. *Id*. The Court assumes that when submitting the settlement proposal, Plaintiff chose to round up the amount to the nearest dollar figure. In any event, GSA's adjustment resulted in an increase to Plaintiff, albeit of a mere $0.22. Unsurprisingly, Plaintiff has not raised any objection to this adjustment. Therefore, the Court accepts the amount of $113,343.78.

H.  *Final Calculation*

With all of the issues regarding individual costs now resolved, the Court shall turn to the total amount that is owed to Plaintiff. That calculation is set forth in the following table:

| Cost Element | Final Amount |
| --- | --- |
| Direct Material Costs | $72,768.13 |
| Direct Labor Costs | $8,502.53 |
| Other Costs | $33,222.50 |
| General and Administrative Expenses | $15,983.24 |
| **Total Costs** | **$130,476.40** |
| Profit | $13,047.64 |
| **Subtotal** | **$143,524.04** |
| Settlements with Subcontractors | $0.00 |

---

[7] ($72,768.13 (Direct Costs) + $8,502.53 (Direct Labor) + $33,222.50 (Other Costs) + $15,983.24 (General & Administrative)) * 0.10 = $13,047.64.

| **Net Amount** | **$143,524.04** |
|---|---|
| Payments Made by GSA | $113,343.78 |
| **Total Amount Due to HJL** | **$30,180.26** |

## V. Conclusion

For the reasons set forth above, the Court holds that Plaintiff is entitled to recover $30,180.26 in settlement costs as a result of the termination of the contract for convenience. Defendant's Motion for Summary Judgment on Damages is hereby **GRANTED** with correction for clerical error and Plaintiff's Motion is hereby **DENIED**. The Clerk is directed to enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge